**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| DOWNINGTOWN AREA SCHOOL DISTRICT | : | No. 45 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 92 CD |
| v. | : | 2022 dated October 6, 2023, |
| | : | Reversing the Order of the Chester |
| | : | County Court of Common Pleas, |
| CHESTER COUNTY BOARD OF | : | Civil Division, at No. 2019-11728-AB |
| ASSESSMENT APPEALS | : | dated January 18, 2022 |
| TAX PARCEL NO.: 33-5-43.3 | : | |
| | : | ARGUED:  September 11, 2025 |
| | : | |
| APPEAL OF:  DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | |
| | | |
| DOWNINGTOWN AREA SCHOOL DISTRICT | : | No. 46 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 93 CD |
| v. | : | 2022 dated October 6, 2023, |
| | : | Reversing the Order of the Chester |
| | : | County Court of Common Pleas, |
| CHESTER COUNTY BOARD OF | : | Civil Division, at No. 2019-11727-AB |
| ASSESSMENT APPEALS | : | dated January 18, 2022 |
| TAX PARCEL NO.: 33-5-43.2 | : | |
| | : | ARGUED:  September 11, 2025 |
| | : | |
| APPEAL OF: DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | |

## OPINION

**JUSTICE MUNDY**                                              **DECIDED:  May 19, 2026**

An owner of real property challenges the policy and practice of a school district in deciding which properties' assessed values to appeal pursuant to Section 8855 of the

Consolidated County Assessment Law (the "Assessment Law").[1]  The Commonwealth Court sustained the challenge, and we allowed further review.  The questions presented include whether taxing districts may implement a policy that uses a monetary threshold to select properties for appeal, and if so, whether the school district applied its policy in a permissible manner in the present case.

## I. Background

Marchwood Apartments (Taxpayer), appellee herein, owns an apartment complex consisting of two parcels operating as a single economic unit (collectively, the subject property).  The parcels are located within appellant Downingtown Area School District, which has a policy under which it only appeals property assessments that may result in additional tax revenues of at least $10,000 per annum.  The policy does not limit the number of appeals the School District may lodge in each tax year, and it instructs the district to appeal without regard for the type or use of the parcel.  It has been in effect since 2012, and during that time appeals initiated by the School District have included properties classified as industrial, farm, commercial, residential, and apartment complex.

For tax year 2020, the School District's consultant, Valbridge Property Advisors, identified fifteen parcels that met the monetary threshold.  Thereafter, the district added the subject property to make sixteen total, none of which was a single-family home.  The School District appealed all sixteen assessments to the county board of assessment appeals.  *See* 53 Pa.C.S. § 8855 (authorizing appeals by taxing districts of properties within their boundaries that they believe are assessed too low).  After the board denied the School District's appeal of the subject property, the district sought judicial review.

---

[1] Act of Oct. 27, 2010, P.L. 895, No. 93, § 2 (as amended 53 Pa.C.S. §§ 8801-8868).  The Assessment Law is a recodification of several prior acts relating to various classes of counties.  It applies to, *inter alia*, counties of the second class A, as well as counties of the third through eighth classes.  *See* 53 Pa.C.S. § 8801(b).

The county court held a *de novo* hearing at which the parties stipulated to the fair market value of the subject property for the relevant tax years – which by then also included 2021 and 2022.[2]  The issue was whether the appeal policy was constitutional, on its face and as applied.  Taxpayer presented the testimony of Reaves Lukens, III, the Valbridge employee who identified the properties to appeal for the School District, and Dr. Peter Angelides, an expert in economics and city planning who testified regarding a study he authored purporting to show most properties in the School District were residential and some of them satisfied the threshold.  The county court reversed the board's decision.  It reasoned that the policy uses a purely economic approach that does not discriminate according to property type, and that residential, commercial, apartment complex, and industrial properties had all been appealed pursuant to it.  It thus set the subject property's fair market value per the parties' stipulation.  *See supra* note 2.

A divided three-judge panel of the Commonwealth Court reversed.  *See Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 303 A.3d 1104 (Pa. Cmwlth. 2023).  The majority observed that while this Court was evenly divided on the permissibility of using a monetary threshold in *GM Berkshire Hills v. Berks County Board of Assessment Appeals*, 290 A.3d 238 (Pa. 2023), the Commonwealth Court had held in that matter, and in prior decisions,[3] that such a threshold is lawful because it reflects an effort to be fiscally responsible and does not amount to purposeful

---

[2] A property's fair market value is the price a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell.  *See Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 772 A.2d 419, 425 n.6 (Pa. 2001).  The subject property was assessed at $32,758,019, and the parties stipulated its fair market value was $78,825,000 in 2020, and $81,750,000 in 2021 and 2022.  *See* Hearing Exhibits B-1 at 12, B-4 at 45.

[3] *E.g.*, *Duffield House Assocs. v. City of Phila.*, 260 A.3d 329 (Pa. Cmwlth. 2021); *Kennett Consol. Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 228 A.3d 29 (Pa. Cmwlth. 2020); *In re Springfield Sch. Dist.*, 101 A.3d 835 (Pa. Cmwlth. 2014); *Weissberger v. Chester Cnty. Bd. of Assessment Appeals*, 62 A.3d 501 (Pa. Cmwlth. 2013).

discrimination. However, the majority found that even if the appeal policy itself was valid, the School District implemented it in an arbitrary manner. The court identified aspects of the record suggesting there were more properties that satisfied the monetary threshold and the original fifteen were chosen arbitrarily; the School District offered no explanation for adding the subject property to the list of fifteen identified by the consultant; and the School District had arbitrarily elected not to appeal a property that met the threshold because that property's attorney was described as "aggressive." *See Downingtown*, 303 A.3d at 1114 ("This random application of a monetary threshold created a lack of uniformity in violation of the Pennsylvania Constitution.").

President Judge Cohn Jubelirer filed a dissenting opinion, agreeing that the policy was valid, and concluding it was validly applied. She disagreed to the extent the majority implied all properties surpassing the threshold must be appealed. She also read the record differently than the majority. She concluded it was unclear whether the School District was aware of the additional properties that met the monetary threshold, the majority selectively read portions of Mr. Lukens's testimony, and the subject property was added to the list because it was recently sold and met the threshold. As for the implication that the School District did not appeal a property because its attorney was "aggressive," she cast that as an oversimplification of the record. She explained the attorney was known to aggressively pursue the dark-store theory which, if successful, would have lowered the property's assessment and caused the School District to lose money, thus making an appeal risky. *Id.* at 1123-24.[4]

---

[4] The property in question was the site of a big-box store (Lowe's). The dark-store theory posits that such properties should be assessed as if they are unoccupied because in an arms-length transaction, their fair market value will be determined without regard for their present use. *See, e.g.*, *Matter of Walmart Stores*, 513 P.3d 457, 471 (Kan. 2022) (quoting Stephen W. Grant, *Who's Afraid of the Dark?: Shedding Light on the Practicality & Future of the Dark Store Theory in Big-Box Property Taxation*, 38 VA. TAX REV. 445, 464 (2019)).

This Court allowed further appeal to consider whether the Commonwealth Court erred (1) by holding that the School District must appeal "all potentially underassessed properties" in order to comply with the Uniformity Clause, or (2) by holding that the School District's implementation of its appeal policy was arbitrary on the present record. *See Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals Tax Parcel No.: 33-5-43.3*, 320 A.3d 661, 662 (Pa. 2024) (*per curiam*).

## II. Governing law

Under the Assessment Law, property owners may appeal their assessments when they believe the property's assessed value is too high. *See* 53 Pa.C.S. §§ 8844 (relating to administrative appeals to a county assessment board), 8854 (relating to appeals to court). Taxing districts such as school districts, *see id*. § 8802 (defining "taxing districts" to include school districts), are also authorized to appeal the assessments of properties within their boundaries, when they believe an assessment is too low. *See id*. § 8855. Although the Assessment Law gives taxing districts discretion to decide which properties to appeal, the exercise of that discretion is limited by the Uniformity Clause, which states:

> All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.

PA. CONST. art. VIII, § 1.

This Court's decision in *Valley Forge Towers Apartments N v. Upper Merion Area School District*, 163 A.3d 962 (Pa. 2017), illustrates one such limitation. In *Valley Forge*, a school district had enacted a policy of only appealing assessments of commercial properties, while not appealing assessments of other types of properties such as single-family homes. The school district claimed it had a neutral motivation: the greater prospect of recouping appeal costs through enhanced tax revenue from commercial properties. We held that targeting specific types of property created a subclass of properties within

the school district that were treated differently than the others, and the appeal policy was accordingly discriminatory in violation of the Uniformity Clause. *See id*. at 978-80 (relying on *Downingtown Area Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 913 A.2d 194 (Pa. 2006), and *Clifton v. Allegheny Cty.*, 969 A.2d 1197 (Pa. 2009)). We clarified that

> nothing in this opinion should be construed as suggesting that the use of a monetary threshold . . . or some other selection criteria would violate uniformity if it were implemented without regard to the type of property in question or the residency status of its owner. Such methodologies are not presently before the Court.

*Id*. at 979 (footnote omitted). Six years later, in *Berkshire*, this Court was evenly divided on whether a school district's policy was non-uniform where a property's assessment would only be appealed if it was recently purchased as shown by data provided by the State Taxation Equalization Board (STEB),[5] and it appeared to be underassessed by at least $150,000 – that is, the recent sales price times the common-level ratio (CLR), minus the current assessed value, was at least $150,000.[6] The prospect of having only recently-purchased properties be eligible for appeal was of particular concern to the Justices who

---

[5] The STEB was established by the State Tax Equalization Board Law. *See* 71 P.S. §§ 1709.1500-1709.1521 (formerly 72 P.S. §§ 4656.1-4656.17). Among other functions, it examines local tax assessment records and other public records, and it compiles data showing the prices at which parcels of real property in each school district have been sold. *See* 71 P.S. § 1709.1508.

[6] The CLR is a countywide figure computed each year. *See* 71 P.S. § 1709.1516a(a). It represents the ratio of assessed value to current market value used generally in the county as last determined by the STEB. *See Clifton v. Allegheny Cty.*, 969 A.2d 1197, 1215 & n.26 (Pa. 2009); *Downingtown Area Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 913 A.2d 194, 200 n.8 (Pa. 2006). The STEB computes the CLR using published "statistically acceptable techniques, including sales ratio studies." 71 P.S. § 1709.1516a(b). The CLR utilized in *Berkshire* was the Berks County CLR for 2017, which was computed as the arithmetic mean of the individual sales ratios for every sale reported to the STEB by Berks County during calendar year 2017, excluding outliers. *See* 48 Pa. Bull. 3392 (June 2, 2018). The parties stipulated that Chester County's CLR in 2020, 2021, and 2022 was .493, .47, and .45 respectively. *See* N.T., 11/17/2021, at 6.

favored reversal in that matter. *See id*. at 253-54 (Opinion in Support of Reversal by Donohue, J.) (expressing that the district's practice of only considering recently-purchased properties created a subclassification by omitting most properties in the district, and observing that, under the policy, two identical townhouses side-by-side would receive differential treatment if only one was recently sold).

### III. Use of a monetary threshold

Unlike the Wilson School District's policy in *GM Berkshire Hills*, the Downingtown Area School District's policy here does not require that the district, in every tax year, limit its consideration to recently-purchased properties. The policy states in full:

**Purpose**

The [School] Board has the responsibility to equalize the cost of providing a quality education among all property taxpayers. The Board is limited in its ability to do this by property assessment procedures and an established appeal process operated under the jurisdiction of Chester County Government.

**Guidelines**

Where in the interest of all property taxpayers an appeal can reasonably be made, the Board will do so under the following conditions:

1. The Chief Financial Officer shall annually review recent real estate transactions *and/or work with a third party firm to identify properties that may be underassessed*.

2. The administration shall provide to the Board a list of tax parcels which have been identified for consideration for a district-initiated real estate tax assessment appeal for the current year. Subject to review and approval of the Board, only property [sic] that may potentially result in total annual additional tax revenue of $10,000 or more to be collected in the aggregate by the taxing districts within the Downingtown Area School District as a result of an appeal will be included on this list.

3. Upon recommendation of the Board, a resolution shall be put before the Board approving tax assessment appeals on such properties as may be appropriate. Notification will then be given to the Chester County Assessment Office of the district's intent to appeal the property's assessment. The annual appeal deadline is August 1st.

Downingtown Area Sch. Dist. Policy Manual § 600, Code 605.1 (Aug. 8, 2012) (Policy 605.1), *reprinted in* RR. 186a, *and* Brief for Appellant at Appx. E (emphasis added).

The emphasized text above, being in the disjunctive, allows the School District to hire a consultant to identify appealable properties instead of reviewing only recent property transactions. *Accord* N.T., 4/14/2021, at 28, *reprinted in* RR. 288a (deposition testimony of David Matyas, the School District's business manager). During the relevant timeframe, the School District worked with a third-party consultant, the aforementioned Mr. Lukens of Valbridge Property Advisors. The evidence he gave at the county court's *de novo* hearing is discussed as needed below, but for present purposes he did not testify that the list of appealable assessments he presented to the school district was limited to recently-purchased properties.[7] Mr. Lukens did, however, confirm that per Policy 605.1, he used a minimum $10,000 tax-liability-deficit threshold, meaning he would not select properties whose expected increase in tax revenues was less than $10,000.[8] That being

---

[7] Mr. Lukens did rely on data about sales within the previous two years, but that information was used to compute an average per-square-foot value, which allowed him to ascertain the likely market value of properties that were not recently sold. *See* N.T., 11/17/2021, at 27-28, 31, *reprinted in* RR. 57a-58a, 61a; Hearing Exhibit M-4, *reprinted in* RR. 189a; Brief for Appellee at 8. He thus did not limit the scope of his review to recently-sold properties. The subject property was added to the list due to its recent sale, as discussed in Part IV(C) *infra*. But Taxpayer's objection centers on the circumstance that it was added via some procedure extrinsic to the consultant's development of a list of fifteen properties to appeal, not on a claim that the School District's methodology discriminated against recently-sold parcels.

[8] A property's "tax-liability deficit" is the difference between the property's current tax liability and what that liability would be if the property's assessment ratio – that is, the ratio of the property's assessed value to its fair market value, *see Valley Forge*, 163 A.3d at 966 n.1 – were to be conformed to the CLR.

the case, the initial question presented herein is whether use of such a threshold, in and of itself – *i.e.*, without any other constraint, including any limitation regarding how recently the property was purchased – is permissible under the Uniformity Clause. If not, the Commonwealth Court's order granting relief to Taxpayer should be affirmed on that basis alone without reaching any other issue.

Where a taxing district's policy along these lines does not create a prohibited subclass of properties defined by an impermissible characteristic such as type, use, neighborhood, or residency status of the owner,[9] it tends to enhance uniformity by selecting for appeal the properties whose assessments are the most nonuniform in terms of their tax-liability deficit.[10] Bringing these assessments in line with the CLR means the property's assessment ratio is still less than about half of the other properties in the county, but it is no longer an outlier. This, in turn, enhances fairness to the remaining taxpayers who would otherwise need to pay more of the cost of government than their proportionate share, as the taxing district would otherwise have to raise its millage to meet budgetary needs. *Accord* Brief for *Amicus* Easton Area Sch. Dist. & Salisbury Twp. Sch. Dist., at 9. And it is the counterpart to the uniformity precept, established in our cases, that overassessed properties must be allowed to lower their assessments to the CLR. *See Keebler Co. v. Bd. of Rev. of Taxes of Phila.*, 436 A.2d 583, 583 (Pa. 1981); *see also Clifton*, 969 A.2d at 1228 (acknowledging that appeals of both overassessed and underassessed properties enhance uniformity by forcing them into conformity with the CLR). Furthermore, a taxing district's use of a monetary threshold to ensure its efforts

---

[9] Nothing in this opinion addresses whether "recently sold" is a prohibited subclass.

[10] *Amicus* Hazelton Area School District argues this is particularly appropriate in light of an alleged practice where sophisticated property owners time their own appeals to coincide with the nadir of the property's fair market value – such as where a shopping center or office building temporarily drops in value after an anchor tenant has vacated. *See* Brief at 19 (referring to this practice as lodging a "suppressive appeal").

are not a net drain on the public fisc reflects an effort by the district to handle public funds in a responsible and judicious manner based on a cost-benefit analysis.[11] We previously suggested the Uniformity Clause might permit this type of selection methodology, *see Valley Forge Towers*, 163 A.3d at 979, and we now hold that the use of a monetary threshold, without more, does not violate the Uniformity Clause.

With that said, we also acknowledge a distinction between the threshold utilized by the Wilson School District in *Berkshire* and the one used by the Downingtown Area School District in this controversy. The Wilson School District appealed properties it believed were underassessed by a certain pre-determined amount, namely, $150,000,[12] regardless of the cumulative millage rate at which the property was taxed.[13] By contrast, the School District here bases its selection on whether an appeal would yield $10,000 in additional taxes in the aggregate by all taxing districts in which that property sits. The expected additional annual tax revenue equals the underassessment multiplied by the cumulative millage rate. By simple arithmetic, then, a property must be underassessed by at least $10,000 divided by the cumulative millage rate to be selected for appeal per

---

[11] *See Valley Forge Towers*, 163 A.3d at 980 (expressing that maximizing revenue and ensuring non-discriminatory implementation of the taxing system do not necessarily conflict); *accord Kennett Consol. Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 228 A.3d 29, 41 (Pa. Cmwlth. 2020) ("Here, the District was using a monetary threshold only for the purpose of making prudent fiscal decisions, and *not* for the purpose of discriminating against sub-classes of properties."), *appeal dismissed*, 259 A.3d 890 (Pa. 2021); *Weissenberger v. Chester Cty. Bd. of Assessment Appeals*, 62 A.3d 501, 506 (Pa. Cmwlth. 2013) ("Judicious use of resources to legally increase revenue is a legitimate governmental purpose.").

[12] A property's underassessment was deemed to be its actual value times the CLR, minus its assessed value. *See Berkshire*, 290 A.3d at 241 (OISA).

[13] We use the phrase "cumulative millage rate" to mean the sum of the millages rates of all taxing districts in which the property is located, such as the county, the school district, the local municipality, and any other taxing authorities (*e.g.*, library districts) – in other words, the full property tax burden imposed on the parcel. A mil, or mill, is one one-thousandth of one dollar, *i.e.*, one dollar of tax levied per $1,000 of assessed value.

Policy 605.1.[14]  The higher the cumulative millage rate, the less the underassessment must be to yield an extra $10,000 per year.[15]

The monetary thresholds used by the School District here and by the Wilson School District in *Berkshire* are both designed to ensure that appeals are not taken against properties that would yield an increase in tax revenues less than the public cost of litigating the appeal.  But where a school district encompasses multiple boroughs or townships with different millage rates, the amount by which a property must be underassessed to be selected will vary depending on where within the School District the property is situated.  We mention this because Taxpayer argues Policy 605.1 violates uniformity on this basis.  *See* Brief for Appellee at 42-44 (positing this scheme creates property subclassifications which are treated differently).

The upshot of the mathematical calculations outlined above is that no matter which type of threshold a school district chooses – an underassessment threshold or a tax-liability-deficit threshold – there will be some other numerical measure that does not fully

---

[14] The amount of the underassessment is the amount the School District seeks to raise the assessment:  the current fair market value multiplied by the CLR, minus the current assessment.  This assumes the CLR varies by more than 15% from the established predetermined ratio (EPR) – which it does in this case – because where such variance is 15% or less the county court is required by statute to use the EPR as the multiplier instead of the CLR.  *See* 53 Pa.C.S. § 8854(a)(3); *see also id*. § 8844(e)(2).  We have previously questioned the constitutionality of Section 8854(a)(3).  *See Downingtown*, 913 A.2d at 202 (describing the provision as giving rise to "an internal, systemic defect" in the statutory scheme, arguably rendering it unconstitutional on its face because, "as a mere consequence of the lodging of an assessment appeal, the benefit of equalization that is otherwise required is lost over a thirty-percent range" of deviation between the CLR and the EPR); *accord Berkshire*, 290 A.3d at 244 (Opinion in Support of Affirmance).  However, we have not yet been asked to adjudicate a challenge to its validity.

[15] The evidence at the *de novo* hearing reflected that in Wallace and West Bradford Townships, a property's assessed value would need to be increased by $316,947 to meet the $10,000 threshold, based on a cumulative tax rate of 31.551 mills.  At the other end of the spectrum, the assessment of a property in Downingtown Borough would only have to be raised by $255,096, based on a cumulative tax rate of 39.201 mills.  *See* N.T., 11/17/2021, at Exhibit M-5, *reprinted in* RR. 191a.

align among all properties. If a school district elects to utilize an underassessment threshold, the resultant tax-liability-deficit threshold will be different depending on the property's location. On the other hand, if it chooses a tax-liability-deficit threshold, as the School District has done here, it will necessarily be employing (at least by implication) a different minimum underassessment threshold depending on the location of the property, as Taxpayer points out. When the various municipalities encompassed by the school district have different millage rates, there simply is no way, mathematically speaking, for all such numbers to align.[16] But the existence of these different millage rates is a function of local law as enacted in different municipalities – presumably based on the different services provided by those municipalities – and it would be a strained reading of the Uniformity Clause to conclude it permits the use of a monetary threshold only where, by happenstance, the cumulative millage rate is identical for all properties within the school district's boundaries.

We recently reaffirmed that the "government must be concerned with ensuring a rough equalization of tax burdens under a structure in which taxes are imposed, adjusted, and collected equitably." *Valley Forge Towers*, 163 A.3d at 979. This "rough equalization" admits of some play in the joints as necessary to comport with mathematical reality, given that "[t]axation is a practical, and not a scientific problem." *Glen Alden Coal Co. v. Schuylkill Cnty. Comm'rs*, 27 A.2d 239, 243 (Pa. 1942); *see also Beattie v. Allegheny Cnty.*, 907 A.2d 519, 529-30 (Pa. 2006). A tax-liability-deficit metric aligns at least as well as an underassessment metric with the Uniformity Clause's textual directive to make taxes "uniform, upon the same class of subjects, within the territorial limits of the authority

---

[16] This problem could be avoided, facially at least, if the School District only cared about the tax-liability deficit to itself based on its own millage rate rather than the overall tax-liability deficit based on the cumulative millage rate. Even if that happened, though, the overall tax-liability deficit needed to meet the threshold would still be different as between properties in different townships.

levying the tax," PA. CONST. art. VIII, § 1, so that one taxpayer does not foist part of his share of the cost of government upon his neighbors. In this regard, we have observed for more than a century that while "every tax is a burden, it is more cheerfully borne when the citizen feels that he is only required to bear his proportionate share of that burden measured by the value of his property to that of his neighbor." *Del. L. & W. R. Co's Tax Assessment*, 73 A. 429, 430 (Pa. 1909); *see Deitch Co. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cty.*, 209 A.2d 397, 401 (Pa. 1965) (affirming the uniformity principle that "a taxpayer should pay no more or no less than his proportionate share of the cost of government"). Accordingly, having held that the Uniformity Clause does not categorically preclude the use of a monetary threshold, we also reject Taxpayer's contention that the different minimum underassessment figures required for properties in different townships within the School District's borders causes the district's methodology to run afoul of our organic law.[17]

### IV. How the threshold was applied in this case

Having concluded the Uniformity Clause does not categorically preclude a taxing district from deciding which properties to appeal by using an express monetary threshold along the lines of the one at issue in this case, we must also consider the way the School District applied its written policy, as the second issue we accepted for review involves

---

[17] *Amicus* Pennsylvania Apartment Association proposes that instead of a monetary threshold, school districts could use a threshold based on the assessment ratio. It suggests, for example, school districts could appeal all properties with an assessment ratio under 85%. *See* Brief at 14-16. Because the CLR may be far lower than .85, *amicus* may be understood as suggesting a school district appeal all properties whose assessment ratio is less than 85% of the CLR – in other words, properties with an *assessment ratio deviation from the CLR* of at least 15%. *See generally Clifton*, 969 A.2d at 1216 (discussing deviations from the median, mean, or weighted mean assessment ratio, and the coefficient of dispersion as a measure of the average such deviation). We do not deny that that approach may be viable under the Uniformity Clause. However, we need not definitively address its merits here because its potential validity has no impact on whether a monetary threshold is also allowable.

whether Policy 605.1 was carried out in a discriminatory manner. Examining the record, the Commonwealth Court listed four ways in which it found that the School District applied its policy in an arbitrary or discriminatory manner: (1) the School District appealed sixteen properties while knowing there were many additional parcels that satisfied the monetary threshold, (2) the School District did not appeal a commercial property that met the monetary threshold "for the sole reason that its counsel was aggressive" – a selection criterion the intermediate court described as "discriminatory on its face and unacceptable as a matter of sound public policy," (3) the subject property was not on Mr. Lukens's original list of properties to be appealed, and the School District offered no explanation for its subsequent addition to the list, and (4) Mr. Lukens testified he lacked any "hard and fast rule" with respect to the methodology he used to identify properties, and he could not explain the flexible "rules" he used, stating only that he was trying to maximize the return to the School District. *See Downingtown*, 303 A.3d at 1113. We now turn to these facets of the record.

### A. More than sixteen properties satisfied the threshold

The first basis on which the intermediate court disapproved the School District's application of Policy 605.1 involved the fact it did not appeal all properties with a projected tax-liability deficiency of at least $10,000. *See id*; *see also id*. at 1114 (faulting the School District for undertaking "piecemeal implementation" of its policy by appealing only sixteen properties while "leaving many other underassessed properties alone"). The Commonwealth Court seems to have held, in effect, that any taxing district which decides to use a monetary threshold must appeal all properties that satisfy the threshold or none at all. Although the court did not cite any authority suggesting the Uniformity Clause imposes that specific requirement, its conclusion seems based on a passage from *Downingtown Area School District v. Chester County Board of Assessment Appeals*, 913

A.2d 194 (Pa. 2006), where this Court stated, "similarly situated taxpayers should not be deliberately treated differently by taxing authorities." *Id*. at 201; *see Downingtown*, 303 A.3d at 1113 (quoting this passage). In *Downingtown*, we indicated that that concept supported a property owner's attempt to lower its assessment using the traditional common-law procedure of submitting evidence of comparable properties, regardless of the average assessment ratio prevailing in the county as a whole. *See Downingtown*, 913 A.2d at 200-02. But until now it has never been relied upon in analyzing how a taxing district must apply an otherwise permissible monetary threshold.

The Commonwealth Court's holding in this regard, if left in place, would lead to an unreasonable result. Taxing districts "cannot reasonably appeal every property within their borders," *Berkshire*, 290 A.3d at 244 (OISA), and the same holds true for all properties meeting a given threshold that happens to sweep in dozens of properties within the taxing district. Here, the evidence suggests over 100 properties out of the 28,000 situated within the School District met the $10,000 threshold. *See, e.g.*, N.T. 11/17/2021, at 25, *reprinted in* RR. 55a (testimony of Mr. Lukens); *accord* Brief for Appellee at 32-33 & n.3, 36. Under the Commonwealth Court's ruling, a taxing district would be unable to employ an otherwise valid financial threshold to narrow down the list of properties to examine further, and then appeal only the most non-uniform of those properties. If the taxing district only has capacity to appeal a certain number of properties per year – which is likely true of all taxing districts given their finite resources[18] – it would have to make a lucky guess at a threshold dollar amount that would yield exactly that number of properties

---

[18] *See* N.T., 11/17/2021, at 16, *reprinted in* RR. 46a (Mr. Lukens's testimony that he originally gave the School District a list of fifteen properties because it had indicated that fifteen "was a manageable size to work with" in light of its "finite amount of manpower and resources"); *see also* Brief for Appellant at 37 (enumerating the substantial costs to the taxing district associated with each appeal, including consultant fees for researching property values, appraiser fees, expert witness fees, filing fees, and attorney fees).

and no more.[19]  Such a rule is impractical and finds no support in the Uniformity Clause's text or history.

It follows that the School District here did not violate uniformity solely by virtue of its failure to appeal all properties meeting the $10,000 minimum.[20]  If the School District had decided to select properties from the list by looking only at one subgroup of properties based on property type or owner residency status, that would obviously violate the uniformity prohibition identified in *Valley Forge*.  But there is no allegation in the present case that the School District did this either directly or through its agent, Valbridge.[21]

### B. The decision not to appeal the Lowe's property

When Mr. Lukens initially compiled the list of fifteen properties, it included one entry for parcel number 40-02-0095.0000 on the tax map, which was a Lowe's Home Improvement store.  This created some confusion because the list reflected "P-Patch Partners" as the owner rather than Lowe's, and it gave P-Patch's address.  It turned out

---

[19] *Amicus* Pennsylvania School Boards Association proffers that low-income school districts, especially rural ones, would find it an "insurmountable task" to appeal even sixteen properties in a single tax year.  It compares the Commonwealth Court's decision to expecting a Pennsylvania State Trooper to pull over every speeding vehicle on a highway, rather than responding to the few vehicles the Trooper is capable of stopping. *See* Brief at 9-10.

[20] To the extent Taxpayer argues Mr. Lukens's testimony indicates the limit of fifteen or sixteen was designed to avoid judicial scrutiny, *see* Brief for Appellee at 36, we disagree. Mr. Lukens testified that one problem with appealing too many properties is a risk that all expenditures would be nullified if this Court declared Section 8855 unconstitutional on its face.  *See* N.T., 11/17/2021, at 19-25, *reprinted in* RR. 49a-55a.  That is an entirely different concept from trying to fly under the radar.

[21] In light of the above, we need not resolve a factual dispute between the parties concerning whether the School District itself (as opposed to its consultant) was aware there were other properties that met the $10,000 threshold.  This disagreement has apparently arisen because the Commonwealth Court stated that the School District "chose to appeal the assessments of sixteen properties *even though it knew* that there were many more properties in the School District that satisfied the monetary threshold." *Downingtown*, 303 A.3d at 1113 (emphasis added).

P-Patch owned a commercial property with a similar tax map number: 40-02-0095.0200. When this discrepancy was brought to Mr. Lukens's attention, he recommended appealing the P-Patch property rather than the Lowe's property.

Mr. Lukens clarified at the *de novo* hearing that there was a typographical error in the parcel number, and it was never Valbridge's intention to include Lowe's on the list. *See* N.T., 11/17/2021, at 59, *reprinted in* RR. 89a. But he had also given the School District a separate reason to leave Lowe's off the list: he knew the attorney handling tax appeals for Lowe's, who was "very aggressive on the dark store theory." Hearing Exhibit M-6 (email from Mr. Lukens to the School District and its solicitor); *see also* N.T., 11/17/2021 at 41-42, *reprinted in* RR. 71a-72a. Mr. Lukens testified such an appeal would have been risky because if the dark store theory were to be credited by a reviewing court – a very real possibility in his mind – the Lowe's assessment could decrease, which would cost the School District money for a fruitless appeal *and* lower its revenue. *See* N.T., 11/17/2021, at 42, *reprinted in* RR. 82a; *see also id*. at 40 (explaining the Lowe's property had "a high risk of blowing up in your face on appeal because you could argue it's over assessed based on the dark store theory"). Finally, Mr. Lukens clarified this would be true regardless of whether he was personally familiar with the attorney handling tax appeals for Lowe's. *See id*. at 43-44, *reprinted in* RR. 73a-74a.

The Commonwealth Court described this situation as one in which a property was not appealed solely because its lawyer was "aggressive." But a fair reading of the record shows Mr. Lukens was centrally concerned that the dark-store theory would prevail and cost the School District money. The attorney being "aggressive on the dark store theory" gave rise to a perceived "high risk" the property's assessment would be decreased. The record does not suggest Mr. Lukens's concern was pretextual or that he recommended against appeal of the Lowe's property for a hidden reason.

As previously mentioned, the Assessment Law gives taxing districts discretion in deciding whether to expend public funds to appeal a particular property, or to refrain from doing so:

> A taxing district shall have the right to appeal any assessment within its jurisdiction in the same manner, subject to the same procedure and with like effect as if the appeal were taken by a taxable person with respect to the assessment . . ..

53 Pa.C.S. § 8855. There is nothing arbitrary or discriminatory when a taxing district considers the risks and potential rewards of appealing a specific property, and ultimately decides not to go forward on the grounds that the financial risk to the district is too high. This is the very type of reasoning, centered on a cost-benefit analysis and an intent to expend public funds wisely, that we approved above when concluding the use of a monetary threshold is not constitutionally prohibited.

Taxpayer argues, however, that this type of consideration is not specifically connected with the School District's monetary-threshold scheme for selecting properties. *See* Brief for Appellee at 38. Taxpayer does not explain why that makes the exclusion of the Lowe's property unconstitutional. As developed in Part IV(A) above, a financial threshold merely narrows down the list of properties within the taxing district to those meriting further investigation as candidates for appeal because they may result in a net gain for the taxing district. It does not obligate the district to appeal each and every candidate property. Moreover, we reject Taxpayer's premise. Considering financial risk is quite clearly intertwined with the district's use of a financial threshold, as explained in the preceding paragraph. If the district perceives, as it did here, that the state of the law taken as a whole makes the appeal of a specific property risky although that property was initially identified under the monetary threshold, nothing in the Uniformity Clause prohibits it from deciding not to go forward with an appeal in light of that risk.

## C. Addition of the subject property

The School District hired Valbridge in April 2019, and Mr. Lukens ultimately provided the School District with a list of fifteen properties the following month. Shortly thereafter, in June 2019, Taxpayer purchased the subject property for $82,000,000. Assuming this approximated the property's fair market value, its assessed value when conformed to the CLR for tax year 2020 would have been $40,400,000, which was $7,600,000 more than its actual assessed value.[22] This, in turn, meant that if the assessment was raised to the CLR, it would yield $240,000 in additional taxes every year, of which $200,000 would flow to the School District.[23] Seeing that this figure easily met the $10,000 threshold, the School District added the subject property to the list of fifteen properties, making sixteen total.

The Commonwealth Court disapproved of this late addition on the sole basis that the School District "offered no explanation" for it. *Downingtown*, 303 A.3d at 1113. Because the court did not indicate the School District's action failed to comply with statutory requirements, it appears to have proceeded under the assumption that an appeal taken without an expressed rationale violates the Uniformity Clause. For its part, Taxpayer does not argue the addition of the subject property was improper on that basis, but rather, because it was purchased after Valbridge completed its analysis, which demonstrates that the subject property was selected based on a "methodology different from the procedure used to select the original list of fifteen properties." Brief for Appellee at 38.

---

[22] All dollar figures are approximate for ease of discussion.

[23] The subject property is situated in Uwchlan Township, where the cumulative millage rate was 31.671 at the relevant time. Of this, the School District's millage was 27.182. *See* Hearing Exhibit M-5, *reprinted in* RR. 191a. As noted above, the CLR for tax year 2020 was .493. *See supra* note 6.

The record does not support the Commonwealth Court's premise that the School District gave no explanation for adding the subject property to the list. The record indicates the School District's solicitor learned about the $82,000,000 sale and contacted the School District's accounting supervisor, Alicia Krebs, to see if the district wanted to add it to the list. Ms. Krebs then verified the sale on the county's website, and presented the information to the district's business manager, David Matyas, who added the property to the extant list of fifteen properties. *See* N.T., 4/6/2021, at 22, 28, *reprinted in* RR. 410a, 416a (deposition testimony of Ms. Krebs). Given the enormous amount of new revenue that the School District could expect from a successful appeal of the subject property, it is obvious that Mr. Matyas made a business decision that it would be worth expending the School District's funds to appeal the subject property – and he confirmed this in his own deposition. *See* N.T., 4/14/2021, at 23-24, *reprinted in* RR. 283a-284a; Brief for Appellant at 36. Thus, even though the subject property was not initially identified by Mr. Lukens, given that the transaction occurred after he compiled his list, there is no support for the premise that the School District gave no reason for its selection.

This leaves the question of whether the School District acted improperly by making the late selection based on the property's sale where the consultant did not identify it. We note that, through use of the "and/or" phraseology, Policy 605.1 allows the School District to do both: use a consultant to identify underassessed properties *and* review recent real estate transactions. Even so, the evidence does not indicate that that happened. Ms. Krebs testified that in some prior years, she used to compile statistics on recent property sales and potential underassessments, and present this information to the business manager. But she clarified that once the School District hired Valbridge, she stopped doing that, and she did not do it for the tax years in question here. *See* N.T., 4/6/2021, at 14-18, *reprinted in* RR. 402a-406a. Therefore, as far as we can tell from the record,

the addition of the subject property to the 2020 list was a one-off, where the School District's solicitor got wind of the sale and informed the district, which then added it to the list in light of the significant amount of money involved.

To evaluate whether the Uniformity Clause prohibits this, we first ask whether, even in the absence of a list of properties, the School District would have been prohibited from appealing the subject property after it learned of the recent sale and the amount paid for the property. The Assessment Law, quoted above, gives the School District discretion to appeal any property it deems worthwhile. Nothing in the record suggests the School District was motivated to appeal the subject property because of its type, usage, or where its new owner lived; rather, it was a transparent attempt to obtain more tax money by conforming the property's assessment to the CLR. That would appear to be the very purpose of Section 8855.

The Uniformity Clause prohibits the systemic differential treatment of a subclass of property defined, for example, by property type or residency status of the owner, as explained in *Valley Forge Towers*, or by neighborhood, as explained in *Clifton*.[24] It does not follow, though, that the Clause prohibits a subclass described simply as "the properties selected by the taxing district for appeal." If it did, that would mean Section 8855 was facially unconstitutional, which in turn would be in substantial tension with our prior observation that the particular appeal policy utilized by a taxing district generally lies within its sole discretion. *See Valley Forge Towers*, 163 A.3d at 980; *see also id*. at 977 ("There are other, nondiscriminatory, methods of deciding which properties to appeal.").

---

[24] In *Clifton*, no government policy expressly discriminated by neighborhood. Rather, the county's long-term use of the base year system without periodic reassessments led to a situation where the properties in some neighborhoods developed different assessment ratios than those in other neighborhoods. *See Clifton*, 969 A.2d at 1208, 1222. We held that the statutory scheme as applied in that manner led to such pervasive disparities as to violate uniformity, thus necessitating a countywide reassessment as the only practical way to cure the widespread nonuniformity. *See id*. at 1227-30.

It would also undermine uniformity because then aggrieved property owners would be able to reduce assessments that are too high, but an aggrieved taxing district would be unable to seek an increase in a property's assessment that was too low.[25]

---

[25] To the extent Justice Dougherty may be construed to interpret the Uniformity Clause to prohibit differential treatment of a subclass of properties defined simply as those parcels the School District chooses to appeal, *see* Dissenting Op. at 8-10 (Dougherty, J.), this, as noted, would render Section 8855 unconstitutional on its face.

Appealing those properties is, in one sense, "treating" them differently than non-appealed properties, because their owners must defend an assessment appeal while neighboring property owners do not have that burden. But if those properties are the most non-uniform, as per the School District's policy here, then leaving them untouched undeniably harms uniformity, as it is directly contrary to the text of the Uniformity Clause which requires that "*taxes* . . . be uniform." PA. CONST. art. VIII, § 1 (emphasis added). This is consistent with the core teaching of *Clifton*: when taxes become nonuniform due to market forces, it is not enough for the government to "treat" all properties the same by taking no action on any of them and relying solely on base-year assessments.

Ultimately, the fact that real property appreciates at different rates sets up a tension whereby taxes inevitably become non-uniform as time goes on, but any attempt to correct the same via Section 8855 cannot help but "treat" some properties differently by correcting their assessments and bringing them into line with the CLR. The confusion in this area of the law appears to stem from the use of the word "treat" or "treatment" in prior cases to mean "tax" or "taxation." *See, e.g., Westinghouse Elec. Corp. v. Bd. of Prop. Assessment*, 652 A.3d 1306, 1314 (Pa. 1995) (indicating the command that "all taxes shall be uniform" means all real estate is a "class entitled to uniform treatment and the ratio of assessed value to market value adopted by the taxing authority must be applied equally and uniformly to all real estate within the taxing authority's jurisdiction"). That has led to the present state of affairs, where correcting a nonuniform tax rate is seen by some as "treating" the taxpayer differently in violation of the Uniformity Clause.

The constitutional text focuses on *taxes* being uniform, which we have interpreted to embody a "proportionality principle" that taxpayers should "pay no more or less than their proportionate share of government." *Clifton*, 969 A.2d at 1224. This requires us to resolve the aforementioned tension in favor of uniformity of tax rate over uniformity of obligation to defend against an assessment appeal. In *Valley Forge*, we addressed a different question: whether this latter type of obligation may be imposed using a method that discriminates based on property type. We held it could not. And in *Berkshire* three Justices concluded there was a constitutional violation where the school district limited its appeals to recently-sold properties. But neither determination dictates that any and all selections of properties to appeal are similarly discriminatory solely because only those property owners, and no others, have their assessment values appealed. And here, selecting the properties with a high enough tax liability deficit to make the appeal a
(continued…)

Consequently, the School District's action in targeting the subject property for appeal based on its underassessment did not, in and of itself, violate the Constitution. Such targeting did not occur based on the property's type, usage, or any other prohibited characteristic, but solely based on the projected enlargement of tax receipts combined with the School District hearing about it through word of mouth.

With that said, the crux of Taxpayer's argument seems to be that, once the School District decided to hire a consultant to formulate a list using the $10,000 threshold reflected in Policy 605.1, it was constitutionally precluded from appealing any other properties whose underassessments came to the School District's attention by some other means. *See* Brief for Appellee at 38 (arguing that the subject property "was selected for appeal based on a review and methodology different from the process used to select the original list of fifteen properties"). Taxpayer argues that the School District used "a series of varying and arbitrary criteria to prepare its final list." *Id*. at 39.

We have already concluded that the School District could have decided to appeal the subject property without reference to the list that Mr. Lukens compiled based on the

---

responsible use of public funds happens to coincide with brining the most non-uniform tax obligations into line with the *average* assessment ratio prevailing in the district, which clearly enhances tax uniformity.

We acknowledge Justice Dougherty separately finds it discriminatory to appeal properties with the highest tax-liability deficit as opposed to the greatest variation from the CLR. *See* Dissenting Op. at 15-18. While the Uniformity Clause may permit use of a greatest-variance-from-the-CLR metric, it does not follow that a greatest-tax-liability-deficit litmus must therefore be unacceptable. This latter measure focuses on bringing outliers into conformity with the average ratio prevailing in the taxing district precisely because they are outliers in real-dollar terms. In our view, that conforms with the Clause's facial directive that "taxes shall be uniform" and is not otherwise impermissibly discriminatory. If those properties were, by virtue of a successful appeal, subjected to a higher-than-average effective tax rate, we would agree with the dissent. But they are not. They are only subject to the same average tax rate all their neighbors are paying. We believe it is an unduly strict reading of the Uniformity Clause to suggest even that type of corrective action is unconstitutional.

$10,000 threshold reflected in the policy. And we disagree to the extent Taxpayer suggests the criterion used to select the subject property was "arbitrary." *Id*. It was not arbitrary, it was based on money.

The "varying" descriptor is somewhat more accurate. Although the same $10,000 threshold was referenced for the subject property, the procedure did vary from that used by Mr. Lukens. Acting as the School District's agent, he undertook a systematic review of the properties in the school district, narrowed that down to a little over 100 properties that met the threshold, and then picked fifteen of those to include on the list. The School District's procedure for the subject property was: learn that a specific property in the School District was just purchased for a large amount of money, check whether it meets the $10,000 threshold – which it easily did – and then add it (and only it) to the list. So long as neither one of those procedures was tantamount to unconstitutional discrimination, which we have concluded they were not, we are unaware of any constitutional principle saying that both procedures may not be used in the same tax year to compile the final list of properties to be appealed.[26]

### D. Lack of a "hard and fast rule"

The final reason articulated by the Commonwealth Court for its finding of constitutional error is that Mr. Lukens lacked any "hard and fast rule" with respect to the methodology he used to decide which of the 100-plus properties satisfying the $10,000 threshold should be placed on the list to be presented to the School District, other than

---

[26] Given that the subject property was added to the list by a separate process from the first fifteen, it may be questioned whether Taxpayer has standing to raise objections to any facet of the School District's methodology other than the use of a $10,000 threshold that the School District admittedly utilized to verify that the subject property should be appealed once it found out about the sale. However, the School District has not objected to Taxpayer's arguments on that basis, and it does not do so now. *See In re Paulmier*, 937 A.2d 364, 368 n.1 (Pa. 2007) (standing is not jurisdictional and, as such, objections to standing must be raised and preserved).

that he was trying to "maximize the return to the School District" via new tax revenues. *Downingtown*, 303 A.3d at 1113.

If Mr. Lukens was indeed trying to "maximize the return," then he *did* use a hard and fast rule, to wit: select the fifteen properties that are expected to yield the greatest collective return to the school district. This is borne out by his testimony, which indicates that maximizing the return was the overall goal, subject to the proviso that the process used by Mr. Lukens and his colleagues at Valbridge was not entirely mechanical. *See* N.T., 11/17/2021, at 26, 32-33, *reprinted in* RR. 56a, 62a-63a. When meeting with colleagues to discuss each parcel that satisfied the threshold, Mr. Lukens would discuss the "relative merits or concerns about the potential" for a given property to generate additional tax revenue. *Id*. at 32, *reprinted in* RR. 62a. It was not clear exactly what was included in the "relative merits or concerns about the potential" for each property. The only clue we have from the record is that sometimes a property that initially seemed likely to have a high yield would be risky due to other concerns such as that the dark-store theory, or any other legal theory, might prevail in court which would cause the appeal to fail or backfire.

The Uniformity Clause does not preclude such a methodology. Valbridge selected the most nonuniform properties in the district with respect to one acceptable metric for nonuniformity – tax-liability deficit – and it did so without regard to property type, usage, or owner residency status. Valbridge's approach maximizes return to the school district, minimizes risk, and brings the most extreme outliers into conformity with the CLR, all of which constitutes a responsible use of public funds and an acceptable way to enhance fairness in how the tax burden is distributed. Although there is some uncertainty here about the exact points discussed in relation to a property's "relative merits or concerns

about the potential," there is no suggestion that they had anything to do with a factor that would be prohibited by the Uniformity Clause.

Taxing districts stand on the solidest ground when their neutral methodologies are spelled out in detail and carefully followed, either directly or through an agent like Valbridge. This applies to a district's method for generating an initial list of properties meeting the designated threshold, as well as how the district narrows that list down to just the properties it plans to appeal. Careful documentation of both the methodology and its application makes it that much easier for a reviewing court to verify that no prohibited selection criteria were used and no discrimination is at play. It also tends to streamline or disincentivize litigation because there is less ambiguity about the underlying facts.

Measured against this ideal, the School District's actions in the instant case leave something to be desired, as there are areas of uncertainty such as exactly what types of concerns would cause Valbridge not to place a particular property on the final list. Nevertheless, it is ultimately the taxpayer's burden to prove unlawful discrimination, not the taxing district's obligation to prove it applied its facially neutral threshold in a lawful manner. *See Fisher Controls Co. v. Commonwealth*, 381 A.2d 1253, 1256 (Pa. 1977) ("A taxpayer complaining that administration of a tax violates its right to be taxed uniformly with others in its class must demonstrate . . . discrimination in the application of the tax" (internal quotation marks and citation omitted)). The evidence as recounted above is insufficient to establish that in applying Policy 605.1, the School District violated uniformity by failing to employ a "hard and fast rule" to narrow the initial list of properties down to the ones it selected for appeal.

## E. Failure to appeal any residential properties for tax year 2020

Taxpayer also challenges the School District's actions in terms of the way it treated residential properties. [27] Taxpayer points out that for tax year 2020, the district did not appeal any single-family residential properties, even though there were some that met the threshold. *See* Brief for Appellee at 2, 16, 27. Taxpayer concludes that Policy 605.1 is being used systematically to discriminate against commercial properties. However, nothing in the policy excludes any type of property, and there was uncontested testimony that, through use of the same policy, the School District appealed a residential property in the past. *See* N.T., June 2, 2021, at 18, *reprinted in* RR. 457a (deposition testimony of school board president Jane Bartone). Therefore, by its terms and in practice the policy allows for the selection of residential properties that meet the financial threshold.

This is relevant because the *Valley Forge* Court clarified a taxing authority is not permitted to "implement a program of only appealing the assessments of one sub-classification of properties, where that sub-classification *is drawn* according to property type – that is, its use as commercial, apartment complex, single-family residential, industrial, or the like." *Valley Forge*, 163 A.3d at 978 (emphasis added). Here, the policy was not drawn according to property type and there has been no systematic exclusion of residential properties.[28] Nor does the record suggest the monetary threshold was

---

[27] In part of Taxpayer's argument on this topic, some of the advocacy can be read to suggest Valbridge's use of different valuation methods as between nonresidential and residential properties was itself unlawful. *See* Brief for Appellee at 39-40. *But cf. id*. at 40 n.5 (acknowledging the income approach may be appropriate for valuing apartment complexes while the sales approach is better for single-family residences). Taxpayer did not include any issue along these lines in its statement of matters complained of on appeal. *See* Pa.R.A.P. 1925(b)(4)(vii) (issues not included in a Rule 1925(b) statement are waived); *Commonwealth v. Rogers*, 250 A.3d 1209, 1224 (Pa. 2021) (same) (citing *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998)).

[28] *Accord Kennett Consol. Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 228 A.3d 29, 39 (Pa. Cmwlth. 2020) (upholding application of a school district policy appealing (continued…)

designed to act as a proxy for property type rather than being reasonably calculated according to the expected financial outlay associated with an appeal.  *See Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, Civil No. 2019-11727-AB, *slip op*. at 3 (C.P. Chester Jan. 14, 2022) (finding that residential, commercial, industrial, and apartment complex properties have all been appealed during the life of Policy 605.1).  In practice it has led to more commercial properties being selected than single-family homes, but that is due to the value of such properties.  If market forces change so that single-family residences rise in value compared to commercial properties, it is expected that more residential properties will be appealed at that juncture.  Thus, the policy is not invalid solely because it has led to fewer appeals of residential properties than commercial, industrial, and apartment-complex properties, and to none for tax year 2020.  Nor is this conclusion altered by the fact that residential properties constitute most of the individual parcels within the School District.

As part of this claim, Taxpayer also argues that several residential properties met the $10,000 threshold but none were selected for appeal.  This contention is based largely on the testimony of Taxpayer's expert, Dr. Angelides.  Referring to his report, *see* N.T., 11/17/2025, Hearing Exhibit M-11, *reprinted in* RR. 197a-214a, Dr. Angelides testified he identified several residential properties that would meet the School District's threshold: one group of five based on sales data as a proxy for current market value, and another group of 25 that had not been sold recently using a hedonic regression analysis to

---

only properties meeting a threshold amount of underassessment without regard to property type, where all appealed properties were commercial but there was no evidence the school district would not have appealed a residential property that satisfied the underassessment threshold), *appeal dismissed*, 259 A.3d 890 (Pa. 2021); *Punxsutawney Area School District v. Broadwing Timber, LLC*, 2019 WL 5561413, at *9 (Pa. Cmwlth. Oct. 29, 2019) (upholding a school district policy that had not "thus far" resulted in the appeal of any residential properties, where the policy itself did not exclude any property by type and so it was possible a residential property would be appealed in the future).

estimate current market value.[29] He concluded to a reasonable degree of professional certainty that the financial threshold used by the School District excluded residential properties substantially more than it excluded other types of properties. On cross-examination Dr. Angelides admitted his hedonic regression analysis did not seek to ascertain the condition of the property or account for that factor's impact on market value, nor did it consider that some of the properties in the two groups he identified were subject to preferential tax treatment under Act 319, which would reduce the amount of additional tax revenue that could be obtained by the raising the assessment.[30] This included most of the properties in the first group of five, and all but one of the properties in the second group of 25. *See id*. at 104-110, 113-15, *reprinted in* RR. 134a-140a, 143a-145a.

Given the above, the record does not reveal whether most of the properties Dr. Angelides identified would meet the $10,000 threshold once their Act 319 status is accounted for. Taxpayer stresses that Act 319 only exempts the land from taxation, not the improvements, *see* Brief for Appellee at 46 n.10, but that is beside the point. Without knowing how much of a difference this favorable tax treatment would have made, Taxpayer did not show that any of the Act 319 properties surpassed the threshold.

---

[29] The expert explained that hedonic regression is a commonly used statistical technique in which a property's individual characteristics – lot size, square footage, number of bedrooms and bathrooms, presence of a fireplace, etc. – are valued individually based on other, recently-sold houses with similar features, and by comparing the selling price of those houses to the selling price of substantially similar properties that lacked that one feature. These individual values are then combined to arrive at the probable value of the property. *See id*. at 93-95, 122-123, *reprinted in* RR. 123a-125a, 152a-153a; *accord City of Miami v. Wells Fargo*, 923 F.3d 1260, 1283 (11th Cir. 2019) (hedonic regression "isolates the factors that contribute to the value of a property by studying thousands of housing transactions [and] determines the contribution of each of these" to the property's value), *judgment vacated as moot*, 140 S. Ct. 1259 (2020).

[30] Act 319 is the Pennsylvania Farmland and Forest Land Assessment Act of 1974, Act of Dec. 19, 1974, P.L. 973, No. 319 (as amended 72 P.S. §§ 5490.1-5490.13), sometimes referred to as the "Clean and Green Law." *See, e.g.*, *Hann v. Fulton Cnty. Bd. of Tax Revision & Assessment*, 2000 WL 36750859, at *1 (C.P. Fulton July 12, 2000).

As well, even though there was one residential property in the group of 25 identified through hedonic regression that was not covered by Act 319, and one or two more in the initial group of five, all that proves is that those two or three parcels should have been within the 100-plus properties initially identified as candidates for appeal.[31] The difficulty for Taxpayer in its present line of reasoning is that those parcels may well have been included in the initial list of candidates, but not finally selected for appeal when Mr. Lukens chose the fifteen properties from the initial list that would generate the most additional tax revenue. Nothing in the record suggests they were not, without which Taxpayer has not demonstrated that the School District arbitrarily refused to consider them on the basis that they were single-family residences.

The above brings into view a distinction worth highlighting. Our cases establish that the Uniformity Clause prohibits intentional or systematic differential treatment of subclasses of property, whether the governmental conduct is "wrongful" or not. *See Valley Forge*, 163 A.3d at 975 (citing cases). But that does not mean the Uniformity Clause imports the concept of "disparate impact" wholesale from civil rights law and applies it the same way. *Accord Punxsutawney Area Sch. Dist.*, 2019 WL 5561413, at *5 ("As to the disparate impact claim, . . . this concept has not been given broad application outside the civil rights context and . . . *Valley Forge* gave no indication that it meant to expand its scope to encompass tax assessment appeals." (internal quotation marks and citations omitted)). The Uniformity Clause focuses on purposeful differential *treatment*, not differential *impact*. A neutral, systematic treatment of all properties might affect

---

[31] For its part, the trial court concluded that all properties were covered by either Act 319, or another statute affording favorable tax treatment, Act 515. *See* Act of Jan. 13, 1966, P.L. (1965) 1292, No. 515 (as amended 16 P.S. §§ 11941-11948). *See generally Downingtown*, 303 A.3d at 1120 n.7 (Cohn Jubelirer, P.J., dissenting) ("Both Act 319 and 515 encourage the preservation of lands for, *inter alia*, agricultural, forestry, and open space uses.").

different properties differently due to their economic value, which varies as the economy and markets fluctuate. To violate the Uniformity Clause, the classification would have to be drawn in a way that indicates the members of one class will be treated differently regardless of such changes, which did not occur here.[32]

The final claim Taxpayer raises concerning the School District's failure to appeal any residential properties relates to Valbridge's use of a 3,500 square foot "cutoff" for single-family residential properties. *See* Brief for Appellee at 41-42. Taxpayer raises a valid concern. If the 3,500-square-foot rule excluded from consideration even a single

---

[32] In dissent Justice Donohue makes her own predictions about future market conditions and concludes, based thereon, that a policy like the one used here will never encompass residential properties, making it non-uniform as a matter of law. *See* Dissenting Op. at 5 (Donohue, J.) (stating there is a "non-existent" possibility market forces will ever bring single-family residences, however valuable, within the list of target properties). The dissent's premise is belied by the situation we faced in *Berkshire*, where the school district used a monetary threshold and there was no dispute it swept in all property types, *see Berkshire*, 290 A.3d at 242 ("[A]ppeals initiated by the School District under the policy have involved industrial, farm, commercial, residential, and apartment complex properties."), and by the fact that in the instant case, Dr. Angelides identified thirty single-family residences that met the $10,000 threshold, a few of which were evidently not subject to preferential tax treatment – not to mention that in a previous year the School District's methodology did, in fact, result in a residence being appealed.

More broadly, it is unclear whether Justice Donohue means to say a monetary threshold is constitutional for a given tax year so long as at least one residence is appealed that year, or perhaps there must be an average of X residences appealed over a multi-year span even if in some of those years no residences are appealed, or alternatively that there must be an equivalent number of parcels of each property type appealed in all years. Regardless, under the dissent's view the monetary threshold itself does not seem especially problematic, so long as the second step of selecting the fifteen or so properties from the initial target list of parcels satisfying the threshold is conducted in a different way than Valbridge did in the present case.

For our part, we reiterate that it is the taxpayer's burden to prove discrimination. *See Fisher Controls*, 381 A.2d at 1256. If a taxpayer shows a facially-neutral monetary threshold is discriminatory in fact because, for instance, it was enacted with discriminatory intent, or it will never target a certain type of property, or it is discriminatory in some other way (*e.g.*, in Berkshire, three Justices were concerned with a policy that only targeted recently-sold properties) – it will be deemed invalid.

parcel that would otherwise have been appealable under Policy 605.1, this would be constitutionally problematic as it would mean residential properties were arbitrarily given favorable treatment. Here, Mr. Lukens testified he did not evaluate such residential properties because they were of insufficient market value to meet the monetary threshold, and thus, spending the time to evaluate them would have been a waste. *See* N.T., 11/17/2021, at 30-31, *reprinted in* RR. 60a-61a.[33] Assuming the 3,500-square-foot rule operated in this way, it indicated that the smaller properties' favorable treatment, *i.e.*, not being included on the list of candidate properties, was not based on their square footage as such, but on the fact they could never have satisfied the $10,000 threshold. Per Mr. Lukens's explanation, then, the 3,500-square-foot minimum functioned as a work- and time-saving device to avoid performing futile property evaluations, not as a way to exclude properties that would otherwise have been eligible for appeal.

Taxpayer primarily responds by pointing out Mr. Lukens could not recall how he came up with that exact number of square feet. *See* N.T., 11/17/2021, at 31, *reprinted in* RR. 61a. But his failure to remember the provenance of the 3,500-square-foot rule does not equate to its substantive invalidity, and Taxpayer has not drawn our attention to any record evidence suggesting the rule excluded any properties that would otherwise have been eligible for appeal under Policy 605.1. This omission is material given that, per our earlier explanation, Taxpayer bore the burden of demonstrating that the School District's application of its policy was arbitrary and discriminatory.

### V. The Equal Protection Clause

In its next claim, Taxpayer asserts that the School District's appeal policy violates the Equal Protection Clause. Taxpayer relies primarily upon the Supreme Court's ruling

---

[33] There were 553 single-family residences in the School District with at least 3,500 square feet, out of 23,591 single-family residences total. *See* Hearing Exhibit M-5, *reprinted in* RR. 190a; Report at 7, *reprinted in* 203a.

in *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County, West Virginia*, 488 U.S. 336 (1989).

> At issue in *Allegheny Pittsburgh* was the practice of a West Virginia county tax assessor of assessing recently purchased property on the basis of its purchase price, while making only minor modifications in the assessments of property that had not recently been sold. Properties that had been sold recently were reassessed and taxed at values between 8 and 35 times that of properties that had not been sold. This Court determined that the unequal assessment practice violated the Equal Protection Clause.

*Nordlinger v. Hahn*, 505 U.S. 1, 8-9 (1992); *see also Murtagh v. Cnty. of Berks*, 634 A.2d 179, 180 n.4 (Pa. 1993) (describing *Allegheny Pittsburgh* as holding that equal protection prohibits the *de facto* discrimination engendered by a "welcome stranger" policy – whereby a newly purchased property is assessed according to its full price while other properties that have not been purchased remain underassessed), *overruled on other grounds*, *Kowenhoven v. Cnty. of Allegheny*, 901 A.2d 1003, 1014 (Pa. 2006).[34]

The county court in the present case rejected Taxpayer's equal protection claim, expressing that the School District's actions were designed to cure "the very wrong" identified in *Allegheny Pittsburgh* because Taxpayer "was woefully underassessed," and if the School District did nothing about it, other taxpayers' rights would be impacted. *Downingtown Area Sch. Dist.*, Civil No. 2019-11727-AB, *slip op*. at 7. This determination was based on the fact that any appeal by the School District seeks to bring the targeted property into conformance with the CLR. Perhaps in light of the trial court's observations, Taxpayer presently references *Allegheny Coal* in relation to Policy 605.1 as a whole, rather than its application to the subject property. *See* Brief for Appellee at 58 (criticizing monetary threshold appeal policies in general). Taxpayer refers to a few generalized

---

[34] Taxpayer additionally references *Bush v. Gore*, 531 U.S. 98 (2000), for the position that the Equal Protection Clause applies to "issues manifesting on the county level." Brief for Appellee at 59. This topic is addressed in Part VI *infra*.

precepts articulated in *Allegheny Pittsburgh*, such as that the "intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the right of one taxed upon the full value of his property," *id*. at 58-59 (quoting *Allegheny Pittsburgh*, 448 U.S. at 345), and applies them by contending that the School District's threshold leaves residential properties systematically undervalued as compared to nonresidential properties. *See id*. at 59-60. Taxpayer argues, in essence, that under equal protection, a taxing district may not fashion an appeal policy that is blind to property type or usage if that policy, in practice, favors residential properties due to their lower value, as compared to commercial properties, industrial properties, or apartment complexes. This would mean districts must instead appeal each property type with roughly equal frequency to avoid having a disparate impact upon one type of property.

We held in Part III above that a taxing district's policy, pursuant to which it appeals the most nonuniform properties as measured by their tax-liability deficit without regard to property type, usage, or owner residency status, enhances uniformity and is permissible under the Uniformity Clause. It allows for the most nonuniform assessments to be corrected precisely because they are the most nonuniform, which is consistent with the goal of tax uniformity. Taxpayer's present contention is a repackaging of the objections it lodged under the Uniformity Clause.

The Equal Protection Clause "sets the constitutional 'floor' for the protection of property owners' rights under the Uniformity Clause." *Valley Forge*, 163 A.3d at 973 (citing *Downingtown*, 913 A.3d at 200-01, 205 n.17). It is less restrictive in that it permits the government to "engage in disparate tax treatment of different sub-classifications of real property, such as residential versus commercial." *Id*. at 967 n.4; *see also Allegheny Pittsburgh*, 488 U.S. at 344 (same). Therefore, *Allegheny Pittsburgh*'s equal protection analysis concerning "welcome stranger" reassessment policies does not readily transfer

to facially-neutral appeal policies that are alleged to have a different impact on residential properties than on commercial ones. Where Taxpayer's argument failed under the Uniformity Clause, it cannot succeed under the Equal Protection Clause.

## VI. Difference from other school districts in the county

Taxpayer's final claim is that the School District's policy violates uniformity because other Chester County school districts utilize different methods and thresholds to identify properties for district-initiated appeals. *See* Brief for Appellee at 56. In this argument, Taxpayer takes a countywide view and does not focus on alleged nonuniformity subsisting solely within the School District.

The School District did not raise this issue in its petition for allowance of appeal. We are generally limited to the issues set forth in such a petition, *see Briggs v. Sw. Energy Prod. Co.*, 224 A.3d 334, 350 (Pa. 2020), and Taxpayer has not articulated any reason an exception should be made in the instant case. With that said, we note that the Commonwealth Court did not reach this issue, as it elected not to address "Taxpayer's remaining constitutional challenges" once it concluded Policy 605.1 was applied in violation of the Uniformity Clause. *Downingtown*, 303 A.3d at 1115 & n.18. Having reversed the intermediate court's judgment in this latter respect, we will remand the matter to that tribunal to address in the first instance any remaining issues that Taxpayer raised and preserved for appellate review.[35]

## VII. Conclusion

Accordingly, the judgment of the Commonwealth Court is vacated, and the matter is remanded to that court for further proceedings consistent with this opinion.

---

[35] If the Commonwealth Court ultimately determines that no other preserved issues warrant relief, it should remand for reinstatement of the county court's judgment, subject, of course, to Taxpayer's right to timely seek further review in this Court.

Justices Wecht, Brobson and McCaffery join the opinion.

Justice Donohue files a dissenting opinion in which Chief Justice Todd and Justice Dougherty join.

Justice Dougherty files a dissenting opinion in which Chief Justice Todd and Justice Donohue join.